In re the Commitment of Barry L. Smalley:
State of Wisconsin, Petitioner-Respondent,

v.

Barry L. Smalley, Respondent-Appellant.†

Court of Appeals

No. 2006AP1475. Submitted on briefs August 14, 2007.
—Decided September 19, 2007.

2007 WI App 219

(Also reported in 741 N.W.2d 286.)

† Petition to review denied 12/19/07.

710

On behalf of the respondent-appellant, the cause was submitted on the briefs of *Donald T. Lang*, assistant state public defender of Madison.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *J.B. Van Hollen*, attorney general, and *Warren D. Weinstein*, assistant attorney general.

Before Brown, C.J., Anderson, P.J., Nettesheim, J.

¶ 1. BROWN, C.J.   This is an appeal from a Wis. Stat. ch. 980 (2005–06)[1] commitment. Barry L. Smalley claims that certain trial testimony obscured the central issue of his dangerousness due to mental disorder. Smalley's counsel did not object to the testimony he now complains of, but Smalley nevertheless asks us to reverse and order a new trial in the interest of justice.

¶ 2.   Smalley first argues that one of the experts misstated the required risk of reoffense for commitment. We agree that the standard was misstated, but we decline to reverse on this ground because we conclude that the expert's isolated misstep did not prevent the

---

[1] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

real controversy from being tried. Smalley also claims that testimony about actuarial instruments was irrelevant because the instruments predict dangerousness without regard to a particular person's mental disorder. We reject Smalley's argument on this point because a showing of dangerousness, though itself insufficient for commitment, is clearly relevant to a showing of dangerousness due to mental disorder. We therefore affirm the trial court.

¶ 3. A Wis. Stat. ch. 980 commitment requires the petitioner to prove beyond a reasonable doubt that the person sought to be committed is a sexually violent person. Wis. Stat. § 980.05(3) and (5). "Sexually violent person" is defined as one who has been convicted of a sexually violent offense and "is dangerous because he or she suffers from a mental disorder that makes it likely that the person will engage in one or more acts of sexual violence."[2] Wis. Stat. § 980.01(7). "Likely" in this context means "more likely than not." Sec. 980.01(1m).

¶ 4. The State petitioned to commit Smalley in March 2005, when he was approaching his date of release from prison, and in March 2006, a jury trial was held. At the trial, the State called as a witness Dr. Anthony Jurek, a DOC psychologist. Dr. Jurek ultimately testified as to his opinion that Smalley was more likely than not to commit a future act of sexual violence. Before he gave this opinion, the following exchange occurred on direct examination:

Q. When you say more likely than not, does that mean it has to be over 50 percent?

A. Well, no. It means that it has to be more likely than not. You know, not, in my mind, means zero. So it has to

---

[2] It is undisputed that Smalley was convicted of a sexually violent offense.

be a rate of . . . potential for reoffense that is significantly more than the rate that they won't reoffend. Fifty percent is not a number that I would use as any kind of a standard.

Q. Is there . . . even any sort of realistic kind of measure? I mean, can you say 50 percent?

A. The problem with picking any specific number is it implies that we are able to say with a very high degree of accuracy this person is a 50 percent but this person's at 49 percent. I don't know that the science available to us is that good yet. I know that it can give me a ballpark figure. It can give me a number of different rates at which I could expect reoffense under different circumstances.

But there are always individual issues that need to be taken into consideration. So to say that you can pick a number I don't think accurately represents the state of the science we have right now.

¶ 5. Later, on cross-examination, Smalley's attorney revisited Dr. Jurek's understanding of "more likely than not":

Q. You testified that it's more likely than not, when you were asked on direct examination, it means any risk greater than zero. Did I hear that right?

A. Yes.

¶ 6. Smalley first posits (and the State implicitly agrees) that the phrase "more likely than not" in the statute means what it says: that an event is more likely to occur than not to occur; that is, has a greater than 50% chance of happening. Thus, in order to find Smalley a sexually violent person, the jury had to conclude that, due to a mental disorder, there was more than a 50% chance that Smalley would commit a

713

sexually violent offense in the future. Smalley argues that Dr. Jurek's testimony presented the jury with an alternative, incorrect standard, and that the jury may well have used that standard to find Smalley a sexually violent person. That is, the jury may have decided that Smalley was "more likely than not" to commit a sexually violent offense because there was a chance greater than zero, i.e., any chance at all, that he would do so.

¶ 7. Smalley's trial counsel did not object to Dr. Jurek's testimony, and so Smalley asks this court to exercise its discretionary reversal power and order a new trial in the interest of justice. *See* WIS. STAT. § 752.35. We may order a new trial regardless of the lack of timely objection where we conclude that the real controversy has not been tried or that it is probable that justice has miscarried. *Id.* Smalley submits that the real issue in the case has not been fully tried.[3] There are two distinct situations in which appellate courts may reverse on this ground: when the jury was erroneously not given the opportunity to hear important testimony that bore on an important issue of the case; and when the jury had before it evidence not properly admitted which so clouded a crucial issue that it may be fairly said that the real controversy was not fully tried. *State v. Hicks*, 202 Wis. 2d 150, 160, 549 N.W.2d 435 (1996). Smalley argues that this case presents the latter situa-

---

[3] He also claims, in his reply brief, that this case presents us with a probable miscarriage of justice. To reverse on this ground, we would have to conclude that there was a substantial probability of a different result on retrial. *State v. Wery*, 2007 WI App 169, ¶ 21, 304 Wis. 2d 355, 737 N.W.2d 66. We do not so conclude, and in any case, arguments advanced for the first time in a reply brief are waived. *See Swartwout v. Bilsie*, 100 Wis. 2d 342, 346 n.2, 302 N.W.2d 508 (Ct. App. 1981).

tion, because the jury, presented with Dr. Jurek's incorrect definition of "more likely than not," may have adopted it.[4] Thus, Smalley argues, the jury may have concluded that he was a sexually violent person without making the requisite finding that there was a better than 50% chance that he would commit another sexually violent offense.

¶ 8. The trial court determined, in response to Smalley's postconviction motion, that Dr. Jurek did not, in fact, testify that "more likely than not" means "any risk greater than zero." We cannot agree with this conclusion; the testimony as a whole is at least ambiguous. At some points, Dr. Jurek seems to be saying only that a precise, accurate prediction about the likelihood of reoffense is not possible. On the other hand, the statement that "not, in my mind, means zero" and the "yes" answer to the point-blank cross-examination question provide strong support for Smalley's interpretation of what Dr. Jurek said.

¶ 9. But even if Dr. Jurek did say that he believed "more likely than not" means "any chance greater than zero" we will only reverse on this basis if Dr. Jurek's statement "so clouded a crucial issue" that the real controversy was not tried. For two basic reasons, we are unconvinced this is the case.

■

¶ 10. First, Dr. Jurek's statement was an isolated occurrence in a three-day trial. During the course of that trial, the issue of whether Smalley was "more likely than not" to reoffend was a main point of contention, and there was a great deal of testimony on it. For

---

[4] We will assume for the sake of argument that Dr. Jurek's testimony on the meaning of the statutory term "more likely than not" constituted "evidence not properly admitted."

715

example, another of the state's witnesses, also a psychologist, testified that "more likely than not" means more than 50% chance of reoffense. Smalley's counsel focused on the 50% standard in his attack on the basis for this psychologist's conclusion that Smalley was more likely than not to reoffend. In both opening statement and closing argument, Smalley's counsel referred to a 50% likelihood of reoffense, and at no time did the State's attorney argue that the standard was otherwise. So the jury heard the correct standard several times over the course of the trial, and it never heard the incorrect standard from anyone besides Dr. Jurek.

¶ 11. Smalley argues, however, that his attorney's statement of the proper standard could not correct Dr. Jurek's erroneous statement because the jury was instructed that the attorneys' arguments are not evidence. Further, Smalley argues, the jury of laypersons may have been predisposed to accept Dr. Jurek's opinion on the issue because he is an expert on psychology and on Wis. Stat. ch. 980 proceedings. This brings us to the second reason that we conclude Dr. Jurek's testimony did not cloud the true controversy such that we should order a new trial: it is patently obvious, to the expert and non-expert alike, what "more likely than not" means.

¶ 12. "More likely than not" is not an obscure or specialized term of art, but a commonly-used expression. It is hard to think of a clearer definition of the term than the term itself; though perhaps its expansion to "more likely to happen than not to happen" is more explicit. We find it difficult to imagine that any juror was without an understanding of the phrase's meaning before, during or after the trial, or that any juror thought that the phrase meant something other than

716

"more likely to happen than not to happen." Given that Dr. Jurek is a psychologist with much experience related to Wis. Stat. ch. 980, a juror might have been willing to take his word on psychological testing, mental disorders, and the like. This does not mean, however, that the same juror would believe Dr. Jurek if he said that the phrase "more likely than not" means "any chance greater than zero" or "at all possible." Everyone would readily agree that a person who buys a state lottery ticket has a chance greater than zero of winning the jackpot – that is, that winning the lottery, however unlikely, is possible. But no reasonable person would say that it is "more likely than not." We simply cannot believe that Dr. Jurek's ambiguous and confusing misstatement would convince a reasonable person to the contrary.

¶ 13.    For this reason, *State v. Neuser*, 191 Wis. 2d 131, 528 N.W.2d 49 (Ct. App. 1995), is distinguishable. In that case, the prosecutor stated during closing arguments: "As to the lesser-included offense, the court did not submit that. The defense requested that and the court granted the request. It's not the court ordering that it be done." *Id.* at 137. We noted that this was an incorrect statement of the law on lesser-included offenses, and further that the prosecutor had presumed to speak for the trial court. *Id.* at 138. We noted that "[t]he prosecutor is a prominent public authority figure in the eyes of a jury. When that figure misrepresents the ruling of the trial court on a crucial matter for jury consideration and, in the same breath, appears to speak for the court on that matter, there can be little doubt that justice has miscarried." *Id.* at 138–39.

¶ 14.    *Neuser* thus involved a prosecutor, presumably regarded by the jury as an authority on the law,

717

giving the jury incorrect information on a crucial point of law. *Id.* The law of lesser-included offenses is not a subject on which the average juror is likely to have much information, in contrast to the meaning of the common phrase "more likely than not." Thus, *it* was reasonable in *Neuser* to fear that the jury would act on the bad information it had been given. *See id.* Here, by contrast, we find no such risk.[5]

¶ 15.   Smalley's other claimed ground for a new trial is the testimony given by Dr. Jurek and another State expert about his scores on various actuarial instruments used to predict the likelihood of reoffense. These instruments consider several characteristics of a given sexual offender, and assign a score to the offender based on the offender's characteristics. The output of the instruments is the percentage of offenders with similar scores to the offender who were recharged with or reconvicted of a sexual offense in a given time span.[6] For example, Dr. Jurek used the Rapid Risk Assessment of Sex Offender Recidivism (RRASOR) to determine that 37% of offenders with Smalley's score were again convicted of a sexual offense within ten years.

¶ 16.   Smalley is not the first committee to attack the use of actuarial instruments in our courts. Their admissibility was challenged in *State v. Tainter*, 2002 WI App 296, 259 Wis. 2d 387, 655 N.W.2d 538. There, we upheld the circuit court's admission of testimony on

---

[5] For the same reasons, we find the jury instruction cases cited by Smalley to be distinguishable. *See State v. Schulz*, 102 Wis. 2d 423, 426–27, 307 N.W.2d 151 (1981). Obviously, a jury that receives improper instructions from the court presents a risk that it will follow those bad instructions; for the reasons discussed above, such a risk is not present in this case.

[6] The instruments used by the experts were the RRASOR, the Static 99 and the MnSOST-R.

the actuarial instruments because they are "the type of information commonly and reasonably relied up[on] by experts in the field of sex offender risk assessment to draw conclusions about future risk." *Id.*, ¶ 20. We noted that Wisconsin's test for the admissibility of scientific evidence is looser than that of the federal courts, in that once the evidence is determined to be helpful to the jury and reliable enough to be probative, its ultimate reliability is a weight and credibility question for the jury. *See id.*, ¶ 21.

¶ 17.  Smalley stresses that his objection to the actuarial instruments is not to their reliability as tools for predicting reoffense. Rather, he argues, even if they are useful in predicting the likelihood that a particular offender will commit another sexual offense, this is not enough. This is because WIS. STAT. ch. 980 states that a sexually violent person is one who "is dangerous because he or she suffers from a mental disorder that makes it likely that the person will engage in one or more acts of sexual violence." WIS. STAT. § 980.01(7) (emphasis added). That is, a person is not a sexually violent person simply because he or she is dangerous, i.e. likely to engage in sexual violence. The person's propensity for sexual violence must be due to a mental disorder. This nexus between mental disorder and the likelihood of sexual violence is not only a statutory requirement, but a constitutional one. *See, e.g., State v. Laxton*, 2002 WI 82, ¶ 11, 254 Wis. 2d 185, 647 N.W.2d 784.

¶ 18.  Smalley notes that the actuarial instruments fail to take an individual's mental disorder into account, and that they therefore predict dangerousness in general, rather than dangerousness due to mental disorder. He argues that because a jury in a WIS. STAT. ch. 980 trial is required to find dangerousness due to

mental disorder, a general prediction of danger is completely irrelevant to the jury's task.[7] Irrelevant scientific evidence is, of course, not admissible, even given the "limited gatekeeper" role of the Wisconsin judge. *See Green v. Smith & Nephew AHP, Inc.*, 2000 WI App 192, ¶ 21, 238 Wis. 2d 477, 617 N.W.2d 881, *aff'd*, 2001 WI 109, 245 Wis. 2d 772, 629 N.W.2d 727 ("expert testimony is admissible if relevant" (emphasis added)).[8]

¶ 19.   Again recognizing that there was no timely objection to any of the testimony he now complains of, Smalley again asks us to reverse in the interests of justice. He argues that the evidence of his dangerousness alone may have persuaded the jury to commit him, without regard to whether he was dangerous as a result of his mental disorder.

¶ 20.   We reject Smalley's argument because we conclude that the actuarial instruments, though they measured dangerousness without regard to Smalley's mental illness, were nevertheless relevant. Relevant evidence is that evidence which tends to make any fact

---

[7] Smalley is not the first committee to make this precise argument, either. *See State v. Burgess*, 2003 WI 71, ¶ 22, 262 Wis. 2d 354, 665 N.W.2d 124. However, the *Burgess* committee claimed that there was insufficient evidence to commit him, and the court found enough other evidence of dangerousness due to mental disorder that it did not consider the argument about the actuarial instruments. *Id.*

[8] Further, contrary to the State's claim, WIS. STAT. § 907.03 does not serve to make otherwise inadmissible testimony admissible simply because an expert relies on it. That statute states only that the expert's *opinion* may be based on otherwise inadmissible evidence, not that the underlying evidence becomes itself admissible. *See State v. Watson*, 227 Wis. 2d 167, 198–99, 595 N.W.2d 403 (1999).

of consequence in the proceedings more or less likely. *See Michael R. B. v. State*, 175 Wis. 2d 713, 724, 499 N.W.2d 641 (1993). Smalley's dangerousness was a fact of consequence to the proceedings; it was not the only fact that needed to be shown, but evidence need not go to every facet of a party's case in order to be relevant. It is true that ultimately, the State needed to show that Smalley was dangerous due to a mental disorder. To that end, it adduced evidence of a mental disorder and evidence that Smalley was dangerous. It also adduced testimony from its experts as to the ways in which Smalley's alleged mental disorder made him dangerous. Evidence of dangerousness, while insufficient on its own to support a commitment, is clearly relevant to the ultimate determination that the jury must make:   dangerousness due to mental disorder.

¶ 21.   As to Smalley's concern that the jury may have found him sexually violent solely based on his dangerousness without properly considering the required nexus between that dangerousness and his mental disorder, we note that the jury was properly instructed on this point. Juries are presumed to follow the court's instructions. *State v. Delgado*, 2002 WI App 38, ¶ 17, 250 Wis. 2d 689, 641 N.W.2d 490. We see no reason to think that this jury did anything other than what it was required to do.

*By the Court.*—Order and judgment affirmed.